T.C. Memo. 2004-35

UNITED STATES TAX COURT

VERNA DOYEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9138-02.                 Filed February 10, 2004.

<u>Terri A. Merriam</u>, <u>Wendy S. Pearson</u>, and <u>Jennifer A. Gellner</u>, for petitioner.

<u>Margaret A. Martin</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined that petitioner did not qualify for relief from joint and several liability pursuant to section 6015(b), (c), or (f).[1]  The issue for decision is

_____

     [1]  Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax
                                                  (continued...)

whether petitioner is entitled to relief from joint and several liability pursuant to section 6015(b) or (f) for 1982, 1983, 1984, 1985, and 1986.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts, second stipulation of facts, third stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time she filed the petition, petitioner resided in Buchanan, Michigan.

Petitioner

Petitioner is a high school graduate and a mother of four. After high school, she worked full time doing "office work".

Around 1960, petitioner married her first husband. She worked full time during this marriage.

Petitioner's marriage to her first husband lasted 7 years. After their divorce, petitioner worked in order to support her children.

---

[1](...continued)
Court Rules of Practice and Procedure.

[2] In her petition, petitioner sought relief pursuant to sec. 6015(b) and (f). Accordingly, sec. 6015(c) is not in issue.

On brief, petitioner argues that she is entitled to sec. 6015 relief for 1981. In her petition, petitioner did not raise her 1981 tax year; in her request for sec. 6015 relief, petitioner did not raise her 1981 tax year; and, in the notice of determination, respondent did not make a determination regarding petitioner's 1981 tax year. Accordingly, petitioner's 1981 tax year is not before the Court.

Petitioner and Her Second Husband Christopher

Petitioner met Christopher Doyel (Christopher) in 1971 and married him in 1973. As of the date of trial, petitioner and Christopher were married and living together.[3]

After she married Christopher, petitioner sold Avon products, Tupperware, and liquid embroidery; she also babysat.

Petitioner's Relationship With Christopher

Christopher never misled petitioner regarding their finances or "anything else". Christopher never hid any information from petitioner. Anything petitioner wanted to see or know, including anything about their finances, he shared with her. Petitioner was welcome to read all financial materials, and other mail, he received.

Christopher never abused petitioner. He never threatened petitioner or forced her to sign anything against her will.

Each December or early January, Christopher drafted a budget for the household bills. After finishing his draft, Christopher discussed the proposed budget with petitioner to make sure there was enough money for projected expenses. If the budget did not balance, petitioner and Christopher decided what expenses to eliminate so they achieved a balanced budget.

---

[3] Since October 2002, Christopher has been working in Charlotte, North Carolina.

Investments

Christopher researched the investments petitioner and Christopher made. Christopher then talked with petitioner about what he learned, and petitioner and Christopher reached an agreement on whether or not to invest in that particular investment. Petitioner and Christopher had an agreement to reach a consensus about investment decisions. Neither did anything without talking it over with the other.

Hoyt Partnerships

Walter J. Hoyt III and some members of his family were in the business of creating tax shelter limited partnerships for their cattle breeding operations (Hoyt partnerships or Hoyt investments). As part of their services, the Hoyt organization also prepared the investor's tax returns. For a description of the Hoyt organization and its operation, see Bales v. Commissioner, T.C. Memo. 1989-568; see also River City Ranches #1 Ltd. v. Commissioner, T.C. Memo. 2003-150; Mekulsia v. Commissioner, T.C. Memo. 2003-138; River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

Investment in SGE 1984-2

Christopher first heard about the Hoyt partnerships in 1983 from a coworker. In 1984, Christopher and petitioner's

financial situation changed, and Christopher thought of the Hoyt investment.

Christopher received promotional materials from the Hoyt organization about the Hoyt partnerships. He read these materials, often several times, and kept them in his files. One of the promotional materials included the following language under the heading Specific Risks Involved: "A change in the tax law or an audit and disallowance by the I [illegible] could take away all or part of the tax benefits, plus the possi [illegible] of having to pay back the tax savings, with penalties and in [illegible]". It further stated:

> Even though the term "head torn off" is crude, it is a concept that is very applicable to the comparison of a disallowance of a tax deduction by the Internal Revenue Service, the prospect of having to pay the taxes back when you have put the tax money into a tax shelter, and its [sic] gone.

The brochure went on to state that there was no assurance that things would be "O.K." In discussing the preparation of investor tax returns, the promotional materials warned "there is a risk" and stated that after many years of experience with tax shelters the Hoyt partnerships have learned how "to deal with I.R.S. audits of the Partnership returns and the Partners personal returns, (being 'attacked' by the I.R.S.)".

The promotional materials also advised prospective investors to "seek independent advice and counsel concerning this investment."

The promotional materials further stated: "If a Partner needs more or less Partnership loss any year, it is arranged quickly within the office without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements."

The promotional materials clearly contemplated the tax shelter being audited by respondent--stating at one point: "we know we will be subject to constant audits by the I.R.S."

After Christopher reviewed the promotional materials, Christopher and petitioner talked about the Hoyt investment. Petitioner did not fully understand how the Hoyt partnerships worked because she did not carefully read the promotional materials. Christopher, however, was always willing to discuss the Hoyt investment with petitioner, and petitioner knew that there were risks associated with the Hoyt investment.

In 1984, petitioner and Christopher invested in Shorthorn Genetic Engineering 1984-2 (SGE 1984-2), a Hoyt partnership. Christopher signed the subscription agreements when they first invested in the Hoyt partnership. Under the heading of ownership, the line next to joint tenants with the right of survivorship was checked.

In 1992, petitioner also signed subscription agreements affirming and accepting the agreements Christopher had signed earlier. Included with the subscription agreements were powers

of attorney, partnership agreements, and a debt assumption agreement.

Petitioner was not forced by Christopher to invest in the Hoyt partnerships. Petitioner agreed to participate in the Hoyt investments upon Christopher's encouragement.

After becoming investors in a Hoyt partnership, petitioner and Christopher attended several meetings with other Hoyt partners. Petitioner made calls to the Hoyt organization.

In 1984, petitioner and Christopher paid no "cash" to SGE 1984-2. In 1985, petitioner and Christopher paid $19,999 in "cash" to SGE 1984-2. By 1986, petitioner and Christopher had paid at least $29,298 in "cash" to SGE 1984-2.

From 1985 through 1996, numerous checks, drawn on petitioner and her husband's joint checking account, were made payable to a Hoyt partnership. These checks totaled almost $25,000. Additional checks, totaling over $14,000, made payable to a Hoyt partnership, were drawn on an account owned by Christopher and the Verna Irene Doyel Trust.

Tax Returns

Petitioner and Christopher filed joint Federal income tax returns for 1982, 1983, 1984, 1985, and 1986. Petitioner signed each of these returns.

On their joint income tax return for 1982, petitioner and Christopher reported $40,609.38 in wages. Attached to this return was a Form W-2, Wage and Tax Statement, for Christopher

from Florida Power Corp. reporting $38,889.90 in wages. In arriving at total income and adjusted gross income, the only subtractions were a $426.06 Schedule C, Profit or (Loss) From Business or Profession, business loss and a $577.65 Schedule E, Supplemental Income Schedule, loss. The total tax listed was $4,160. The Federal income tax withheld listed was $5,225.34. Christopher prepared the 1982 return.

On their joint income tax return for 1983, petitioner and Christopher reported $42,570 in wages. Attached to this return was a Form W-2 for Christopher from Florida Power Corp. reporting $42,363.66 in wages. In arriving at total income and adjusted gross income, the only additions and subtractions were $214.21 in interest income, an $800.50 Schedule C business loss, and a $753.62 Schedule E loss. The total tax listed was $5,102. The Federal income tax withheld listed was $5,741.01. Christopher prepared the 1983 return.

On their joint income tax return for 1984, petitioner and Christopher reported $47,234 in wages. Attached to this return was a Form W-2 for Christopher from Florida Power Corp. reporting $47,096.20 in wages and a Form W-2 for petitioner from "Mad. Health Spa of St Pete, Inc" reporting $138.32 in wages. In arriving at total income, the only additions and subtractions were $92 in interest income and a $30,270 Schedule E loss. This Schedule E loss was entirely attributable to petitioner and Christopher's investment in SGE 1984-2. Petitioner and

Christopher also subtracted $645 in adjustments to income to arrive at adjusted gross income. The total tax listed was zero. The Federal income tax withheld listed was $6,609. The Tax Office of W.J. Hoyt Sons Management Co. was listed as the return preparer on the 1984 return.

On their joint income tax return for 1985, petitioner and Christopher reported $49,748 in wages. In arriving at total income, the only additions and subtractions were $1,022 in interest income, $300 in dividends, an $8 capital gain, and a $23,719 Schedule E loss. This Schedule E loss ($20,180) was mostly attributable to petitioner and Christopher's investment in SGE 1984-2. Petitioner and Christopher also subtracted $2,609 in employee business expenses to arrive at adjusted gross income. The total tax listed was zero. The Federal income tax withheld listed was $1,703. The Tax Office of W.J. Hoyt Sons Management Co. was listed as the return preparer on the 1985 return.

On their joint income tax return for 1986, petitioner and Christopher reported $50,407 in wages. In arriving at total income, the only additions and subtractions were $237 in interest income, $691 in dividends, a $1 capital gain, and a $22,620 Schedule E loss. This Schedule E loss ($20,180) was mostly attributable to petitioner and Christopher's investment in SGE 1984-2. Petitioner and Christopher also subtracted $1,523 in employee business expenses and a $2,000 IRA deduction to arrive at adjusted gross income. The total tax listed was $240. The

Federal income tax withheld listed was $394.  The Tax Office of W.J. Hoyt Sons Management Co. was listed as the return preparer on the 1986 return.

The Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued by SGE 1984-2 to petitioner and Christopher for 1984, 1985, and 1986 list the following under the area for partner's name:  "Christopher & Verna Doyel".

In reviewing the 1984 return, the $30,270 loss surprised petitioner because it was so large, but she did not ask any questions about this deduction.  Petitioner and Christopher merely assumed that the losses would be large enough so that all withheld income taxes would be refunded to them.

In 1985, petitioner and Christopher applied for a refund of their 1981, 1982, and 1983 taxes in the amounts of $3,531, $4,160, and $5,102, respectively.

On March 11, 1998, respondent mailed petitioner and her husband two letters and reports explaining computational adjustments made to their 1981, 1982, 1983, 1984, 1985, and 1986 returns as a result of adjustments made to the partnership returns of SGE 1984-2 for 1981, 1982, 1983, 1984, 1985, and 1986. These computational adjustments resulted from the Court's opinion in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1996-515.

Section 6015 Claims--General

Currently, all section 6015 cases are centralized in respondent's Cincinnati Service Center. The centralized unit, called the "Innocent Spouse Unit", was set up in 1999. When the Innocent Spouse Unit was set up, the unit anticipated about 600 cases per year; however, in its first year the Innocent Spouse Unit received approximately 70,000 cases.

When an Innocent Spouse Unit employee is assigned a case, the employee requests documents, reviews the file, and then makes a determination. In all requests for relief pursuant to section 6015 made by Hoyt investors, respondent's employees request available internal documents regarding the Hoyt cases. Respondent works on section 6015 cases, including those involving Hoyt investors, on a case-by-case basis.

Request for Relief From Joint and Several Liability

On July 19, 2000, petitioner mailed respondent a Form 8857, Request for Innocent Spouse Relief (and Separation of Liability and Equitable Relief). Betty Sneed, a financial assistant in the Innocent Spouse Unit, was assigned to review petitioner's request for section 6015 relief.

Ms. Sneed reviewed petitioner's entire file. In processing petitioner's claim, Ms. Sneed requested Hoyt partnership related information regarding petitioner and Christopher from Revenue

Agent Deborah Ritchie.[4]  Ms. Richie provided Ms. Sneed with a computer printout for Hoyt partnership taxable years related to petitioner and Christopher, copies of agreements and powers of attorney signed by petitioner and/or Christopher, copies of Schedules K-1 issued to petitioner and Christopher from the Hoyt partnerships, and copies of checks made payable to Hoyt partnerships drawn on petitioner's and her husband's joint checking account and on an account owned by Christopher and the Verna Irene Doyel Trust.

On April 20, 2001, petitioner sent a declaration of Christopher B. Doyel to the Cincinnati Service Center (Christopher's declaration).  In Christopher's declaration, he stated:  "I decided to investigate the investment opportunity with the Hoyt partnerships.  Initially, my spouse did not attend any meetings, but, did read some promotional literature on the Hoyt partnership investments.  After we were involved my spouse did attend approximately three meetings."  Christopher also stated that petitioner signed the subscription agreements and that petitioner never asked any questions about the Hoyt

_____

[4]  Ms. Ritchie worked on the "Hoyt audit team" and the "Hoyt tax shelter project".  The Hoyt tax shelter project examined Hoyt partnerships.  Ms. Ritchie assisted District Counsel in preparing Hoyt partnership cases for trial.

partnership investment until they declared bankruptcy (sometime after the years in issue).

On June 5, 2001, respondent mailed Christopher a letter notifying him of petitioner's request for relief from joint and several liability.

On October 26, 2001, respondent mailed petitioner a preliminary determination with respect to petitioner's request for relief from joint and several liability for 1982 through 1986. Respondent determined that petitioner was not entitled to relief pursuant to section 6015(b), (c), or (f).

On February 11, 2002, respondent mailed petitioner a notice of determination that determined petitioner was not entitled to relief from liability pursuant to section 6015(b), (c), or (f) for 1982 through 1986 (notice of determination). On Form 886-A, Explanation of Items, attached to the notice of determination, regarding section 6015(b) respondent explained:

> We have concluded that you had actual knowledge or reason to know of the item giving rise to the understatement. The following factors were considered in reaching this conclusion:
>
> - You signed one or more partnership/subscription agreements/powers of attorney with respect to the Hoyt partnerships.
>
> - You signed personal checks made payable to W.J. Hoyt Sons or other Hoyt entity.

- You signed other correspondence/documents relating to the Hoyt partnerships.

- The size of the loss/deduction in relation to the income reported on the return would reasonably put you on notice that further inquiry would need to be made.

- You have not shown that you satisfied your duty of inquiry at the time the return was prepared and signed to make sure the return was correct.

- Your investment in the Hoyt partnerships was a joint investment with your spouse giving you actual knowledge of the item giving rise to the deficiency.

You cannot claim relief under section 6015(b) with respect to your own erroneous items and you have not shown that the erroneous items are attributable to your spouse.

You have not shown that it would be inequitable, taking into account all of the facts and circumstances, to hold you liable for the deficiency attributable to the understatement.

Respondent also explained why petitioner did not qualify for relief under section 6015(c). Regarding section 6015(f), respondent wrote: "You have not shown that it would be inequitable, taking into account all of the facts and circumstances, to hold you liable for the deficiency attributable to the understatement."

On or about April 9, 2002, Ms. Sneed forwarded petitioner's case to respondent's Appeals Office. Appeals Officer Gloria Flandez was assigned to review petitioner's case. In November

2002, Ms. Flandez completed her review. Ms. Flandez concluded that petitioner was not entitled to relief from liability pursuant to section 6015(b), (c), or (f) for 1982 through 1986.

OPINION

## I. Evidentiary Issue

As a preliminary matter, we must decide whether a document petitioner submitted during the trial of this case should be admitted into evidence. At trial, petitioner sought to introduce a "fraud referral" memorandum for Walter J. Hoyt III (Exhibit 120-P). Respondent objected to the admission of Exhibit 120-P on the grounds of authentication, relevance, and hearsay. We reserved ruling on Exhibit 120-P's admissibility.

Petitioner failed to make any arguments regarding the admissibility of Exhibit 120-P in her opening brief. In her reply brief, petitioner stated: "Petitioner has addressed the relevance and purpose of Exhibit 120-P in her opening brief, in the context of proposed findings of fact."

Petitioner's requests for findings of fact in her opening brief are not argument for the admissibility of Exhibit 120-P. Merely requesting a finding of fact does not automatically make the requested finding relevant. On this basis, we can conclude that petitioner abandoned this issue. Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989).

Even were we to conclude that petitioner did not abandon this issue, petitioner makes no argument regarding the authenticity of Exhibit 120-P or why Exhibit 120-P is not excludable as hearsay. Fed. R. Evid. 802-804, 807, 901. Furthermore, petitioner's belated, conclusory assertion in her reply brief that Exhibit 120-P is relevant is insufficient. We find Exhibit 120-P to be hearsay, lacking authenticity, not relevant to the issue of petitioner's being entitled to section 6015 relief. Furthermore, even if we did not so find, it would be within our discretion to exclude Exhibit 120-P as wasteful. Fed. R. Evid. 403.

Accordingly, we do not admit Exhibit 120-P into evidence.

## II. Section 6015 Relief

In general, spouses filing joint Federal income tax returns are jointly and severally liable for all taxes due. Sec. 6013(d)(3). Under certain circumstances, however, section 6015 provides relief from this general rule. Except as otherwise provided in section 6015, petitioner bears the burden of proof. Rule 142(a); Jonson v. Commissioner, 118 T.C. 106, 113 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

In arguing that petitioner is entitled to relief pursuant to section 6015, petitioner also relies on the regulations related to section 6015. Sections 1.6015-0 through 1.6015-9, Income Tax

Regs., are applicable for elections or requests for relief filed on or after July 18, 2002. Sec. 1.6015-9, Income Tax Regs. Petitioner filed her election prior to this date; accordingly, the regulations are inapplicable.

A.    Relief Under Section 6015(b)

To qualify for relief from joint and several liability under section 6015(b)(1), a taxpayer must establish:

> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>
> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;
>
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>
> (E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election * * *.

The requirements of section 6015(b)(1) are stated in the conjunctive. Accordingly, a failure to meet any one of them is sufficient for us to find that petitioner does not qualify for relief pursuant to section 6015(b). Alt v. Commissioner, 119

T.C. 306, 313 (2002).

Respondent contends that petitioner failed to meet the requirements of subparagraphs (B), (C), and (D).  For the sake of completeness, we shall discuss the application of 6015(b)(1)(B), (C), and (D).  See Jonson v. Commissioner, supra at 119.

     1.   Section 6015(b)(1)(B):  Attributable to One Spouse

Petitioner admits that the Hoyt investment caused the erroneous items on the returns.  Petitioner, however, contends that the Hoyt investments are not attributable to her.

Petitioner was a joint investor with Christopher in the Hoyt investments.  She signed documents relating to her and Christopher's investment in the Hoyt investments.  See Hayman v. Commissioner, 992 F.2d 1256, 1260-1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228.  From the inception, the documents listed the Hoyt investment as a joint investment of petitioner and Christopher.

Additionally, checks were drawn on their joint account and on a trust account apparently belonging to petitioner.  These checks were made payable to Hoyt partnerships.

Furthermore, it is clear that the Hoyt organization treated her as a joint investor with Christopher in the Hoyt partnerships.  The Schedules K-1 the Hoyt organization issued regarding their investment in SGE 1984-2 listed petitioner as a

joint investor with her husband.

Finally, Christopher may have taken the initiative and researched the Hoyt investment, but petitioner agreed to invest in the Hoyt partnerships and she did it jointly with Christopher. All investment decisions in the Doyel household were made jointly by petitioner and Christopher.

Accordingly, we conclude that the understatements are not attributable to the erroneous items of one individual filing the joint returns.

2.    Section 6015(b)(1)(C):  Know or Reason To Know

The requirement in section 6015(b)(1)(C), the no-knowledge-of-the-understatement requirement, is virtually identical to the same requirement of former section 6013(e)(1)(C); therefore, cases interpreting former section 6013(e) remain instructive to our analysis.  Jonson v. Commissioner, supra at 115; Butler v. Commissioner, 114 T.C. 276, 283 (2000).

The relief-seeking spouse knows of an understatement of tax if she knows of the transaction that gave rise to the understatement.  E.g., Purcell v. Commissioner, 826 F.2d 470, 473-474 (6th Cir. 1987), affg. 86 T.C. 228 (1986).  The relief-seeking spouse has reason to know of an understatement if she has reason to know of the transaction that gave rise to the understatement.  E.g., Bokum v. Commissioner, 94 T.C. 126, 146 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).  Courts

consistently apply these standards to omission of income cases; however, some Courts of Appeals, starting with the U.S. Court of Appeals for the Ninth Circuit, have adopted a more lenient approach to deduction cases.  Kistner v. Commissioner, 18 F.3d 1521 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463; Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989), revg. an Oral Opinion of this Court.  In Bokum v. Commissioner, supra at 153, we declined to apply the Price approach to deduction cases; however, under the rule established in Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we are bound to defer to the decision of a Court of Appeals that is squarely on point and which is the likely venue for appeal.  Jonson v. Commissioner, 118 T.C. at 116.

Petitioner contends that the U.S. Court of Appeals for the Eleventh Circuit, which has adopted the Price approach, is the likely venue for appeal because petitioner currently resides in Florida.[5]  Respondent contends that the U.S. Court of Appeals for the Sixth Circuit is the likely venue for appeal.

Contrary to petitioner's assertion, it is section 7482, and not 28 U.S.C. section 1391 (2000), that provides the Courts of Appeal with jurisdiction to review our decisions.  Section

---

[5]  Although petitioner claims to currently reside in Florida, we note that since October 2002, Christopher has worked full time in North Carolina (where he and petitioner own a home), and petitioner lives with her husband.

7482(b)(1) provides that the venue for appeal of a case involving a petitioner who is an individual is the legal residence of the petitioner.  Sec. 7482(b)(1)(A).  Legal residence is determined as of the time the petition was filed.  Sec. 7482(b)(1) (third sentence).

At the time she filed the petition, petitioner resided in Michigan.  Accordingly, in the absence of a stipulation to the contrary, the U.S. Court of Appeals for the Sixth Circuit is the likely venue for any appeal of this case.  See sec. 7482(b)(2).

We have found no published authority of the U.S. Court of Appeals for the Sixth Circuit adopting the Price approach.  The U.S. Court of Appeals for the Sixth Circuit has adopted the following standard for reason to know in deduction cases:

> The test adopted by the *Sanders* court is the same test advanced by the Restatement (Second) of Agency § 9, comment *d* (1958), which reads as follows:
>
>> A person has reason to know of a fact if he had information from which a person of ordinary intelligence which such person may have, or of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, in exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence.
>
> The primary ingredients of the "reason to know" tests are (1) the circumstances which face the petitioner; and (2) whether a reasonable person in the same position would infer that omissions or erroneous deductions had been made.  [Shea v. Commissioner, 780

F.2d 561, 565-566 (6th Cir. 1986) (citations omitted), affg. in part and revg. in part T.C. Memo. 1984-310.]

We believe that petitioner had reason to know of the understatements under the approaches followed by the Tax Court and the U.S. Courts of Appeals for the Sixth and Eleventh (which has adopted the Price approach) Circuits, and any disparity among them is immaterial to our disposition of this case. See Jonson v. Commissioner, supra at 116.

### 3. Result of the Price Approach in This Case

In Price v. Commissioner, supra at 965, the Court of Appeals for the Ninth Circuit stated:

> A spouse has "reason to know" of the substantial understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement. Factors to consider in analyzing whether the alleged innocent spouse had "reason to know" of the substantial understatement include: (1) the spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. [Citations omitted.]

"The interplay of these factors is dynamic, so that different factors will predominate in different cases." Bliss v. Commissioner, 59 F.3d 374, 378 (2d Cir. 1995), affg. T.C. Memo. 1993-390. One factor may dominate the analysis and alone be reason for denying relief. Id. at 379.

Under the Price approach, a spouse's knowledge of the transaction underlying the deduction is not irrelevant; the more a spouse knows about a transaction, the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid. Price v. Commissioner, 887 F.2d at 963 n.9; see Hayman v. Commissioner, 992 F.2d at 1261 (citing Price).

### a. Education

Petitioner had a high school education.

### b. Involvement in Financial Affairs

Petitioner argues that she was not involved in the family's financial affairs. Being a homemaker, being focused on family affairs, and lacking sophistication in financial affairs does not relieve a taxpayer of joint and several tax liability. Shea v. Commissioner, supra at 566. Additionally, complete deference to the other spouse's judgment concerning the couple's financial affairs, standing alone, is insufficient to establish that a spouse had no "reason to know". Kistner v. Commissioner, supra at 1525.

Contrary to her assertion, petitioner was involved in her family's financial affairs. Although she may have not played a "dominant" role or been the initiator, all family investment decisions were made in consultation with petitioner. Petitioner and her husband had an agreement to reach a consensus about

whether or not to make an investment before any investment was made.

Petitioner was shown the documents relating to the Hoyt investments, signed Hoyt investment documents, was aware that the Hoyt investment was supposed to result in substantial tax savings, and attended Hoyt investor meetings.[6]  Petitioner was aware of the large deductions taken on her joint tax returns associated with the Hoyt investments.  The Hoyt investment materials she was shown and had the opportunity to review apprised her of tax risks associated with the investment.  These facts establish that petitioner had "reason to know".  See Jonson v. Commissioner, supra at 117.

Petitioner argues that her health issues limited her involvement in financial affairs.  In the mid-1970s, petitioner was diagnosed with sarcoidosis--a disease that affects the lymphatic system.  Petitioner developed tumors in her body and has a reduced lung capacity.  Despite her illness, the testimonial and documentary evidence establishes that petitioner participated in the family's financial affairs.

### c.    Expenditures, etc.

The evidence does not establish that the tax savings generated by the Hoyt investments resulted in lavish or unusual expenditures benefiting petitioner compared to prior years'

---

[6]  Although petitioner claimed not to attend Hoyt meetings, her testimony was contradicted by Christopher's testimony and the documentary evidence.

spending.  This factor, however, is not determinative.  Id. at 118.

The losses helped to reduce petitioner and her husband's reported tax liabilities for 1984 through 1986 to a total of $394.  Such deductions, which shelter such a large percentage of the income reported on the returns, support a finding that petitioner had reason to know of the understatement.  Id.

Section 6015 relief "was not designed to protect willful blindness or to encourage the deliberate cultivation of ignorance."  Friedman v. Commissioner, 53 F.3d 523, 525 (2d Cir. 1995), affg. in part and revg. and remanding in part T.C. Memo. 1993-549.  "Extravagant tax savings may alert even a financially unsophisticated spouse to the possible improprieties of a tax scheme."  Id.

### d.  Other Spouse's Evasiveness and Deceit

Where one spouse is "cunning and systematic" in concealing the understatement of taxes, the other spouse may plausibly claim ignorance notwithstanding some educational attainments or some involvement in family financial affairs that are distinct from the understatement of taxes.  Bliss v. Commissioner, supra at 379.  Disclosure by the other spouse, however, is probative in determining that relief is inappropriate.  Id.; see also Hayman v. Commissioner, supra at 1262, 1263 (lack of deceit by other spouse important factor in denying relief).

Petitioner and her husband testified that petitioner was aware of the investment in the Hoyt partnerships, she had access to all of the files/information regarding the Hoyt investment, and that Christopher made no effort to deceive petitioner regarding the family's financial affairs. This further supports a finding that petitioner had reason to know of the understatement. Jonson v. Commissioner, supra at 118.

Petitioner claims that Mr. Hoyt's deceit is relevant to the determination of "reason to know". Although Mr. Hoyt's deceit may be relevant, it does not lead to the result petitioner seeks.

The purpose of section 6015 relief is to protect one spouse from the overreaching or dishonesty of the other. Purcell v. Commissioner, 826 F.2d at 475. Relief is inappropriate where it would allow the requesting spouse to escape liability for apparently legitimate claims that are later disallowed. See Bartlett v. Commissioner, T.C. Memo. 1997-413.

As was the case in Mora v. Commissioner, 117 T.C. 279, 288 (2001), where we denied relief under section 6015(b) in a case involving Hoyt investments, neither petitioner nor Christopher knew the facts that made the flowthrough losses from the Hoyt partnerships unallowable as deductions on their joint returns and both petitioner and Christopher put their trust in the Hoyt organization to determine the basis for, propriety of, and amount of their deductions.

e. <u>Conclusion</u>

It is significant that petitioner knew (1) of the Hoyt investment, (2) the Hoyt investment was designed to generate large deductions resulting in substantial tax savings, (3) those deductions were taken on joint returns for the years in issue, and (4) there was a risk that the deductions might be disallowed by the IRS.  <u>Jonson v. Commissioner</u>, 118 T.C. at 118.

"Tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing * * * the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability."  <u>Hayman v. Commissioner</u>, 992 F.2d at 1262.  Furthermore, the court in <u>Price</u> noted that the size of the deduction in issue vis-a-vis the total income reported on the return, when considered in light of the fact that the taxpayer knew of the investment and its nature, is enough to put the taxpayer on notice that an understatement exists (and, therefore, if the duty of inquiry is not discharged, leads to an imputation of "reason to know" of the understatement).  <u>Price v. Commissioner</u>, 887 F.2d at 966 ($90,000 deduction and just more than $100,000 in income).

Petitioner did not ask any questions about the Hoyt investment deductions even though the loss surprised petitioner because it was so large.  Petitioner never asked any questions about the Hoyt partnerships until they declared bankruptcy (after

the years in issue).  Petitioner did not satisfy her duty to inquire.  Id. at 965-966; see also Mora v. Commissioner, supra at 289 (involving a Hoyt investment).

A reasonable person, faced with petitioner's circumstances and in petitioner's position, would have had reason to know of the understatement.  We conclude that, under both the U.S. Court of Appeals for the Sixth Circuit's standard and the Price approach, petitioner had reason to know of the understatements.

### 4.  Section 6015(b)(1)(D):  Inequitable To Hold Liable

The requirement in section 6015(b)(1)(D), that it be inequitable to hold the requesting spouse liable for an understatement on a joint return, is virtually identical to the same requirement of former section 6013(e)(1)(D); therefore, cases interpreting former section 6013(e) remain instructive to our analysis.  Butler v. Commissioner, 114 T.C. at 283.

Whether it is inequitable to hold a spouse liable for a deficiency is determined "taking into account all the facts and circumstances".  Sec. 6015(b)(1)(D).  The most often cited material factors to be considered are (1) whether there has been a significant benefit to the spouse claiming relief, and (2) whether the failure to report the correct tax liability on the joint return results from concealment, overreaching, or any other wrongdoing on the part of the other spouse.  Alt v. Commissioner, 119 T.C. at 314; Jonson v. Commissioner, 118 T.C. at 119.

No such untoward circumstances are present in this case.  It
is clear that there was no concealment on Christopher's part.
Christopher never hid information from petitioner, petitioner was
welcome to read all the Hoyt investment materials, Christopher
was always willing to discuss the Hoyt investment with
petitioner, petitioner never asked any questions about the Hoyt
partnership investment until she and Christopher declared
bankruptcy (after the years in issue), and petitioner did not
question the large deductions associated with the Hoyt
investment.  Additionally, the evidence established that
Christopher never attempted to deceive her with respect to their
financial affairs.

As we noted <u>supra</u>, the purpose of section 6015 relief "is to
protect one spouse from the overreaching or dishonesty of the
other."  <u>Purcell v. Commissioner</u>, 826 F.2d at 475.  The
understatement in tax in this case is attributable to a mistaken
belief on the part of both petitioner and Christopher as to the
legitimacy of the tax shelter deductions.  Under these
circumstances, we perceive no inequity in holding both spouses to
joint and several liability.  <u>Bokum v. Commissioner</u>, 992 F.2d at
1135; <u>McCoy v. Commissioner</u>, 57 T.C. 732, 735 (1972).

We have also considered other factors that are relevant to
whether it would be inequitable to hold petitioner liable.  We
find that petitioner will not experience economic hardship if

relief from the liabilities is not granted given her current level of income. See <u>Alt v. Commissioner</u>, <u>supra</u> at 314-315; <u>Von Kalinowski v. Commissioner</u>, T.C. Memo. 2001-21; <u>Walters v. Commissioner</u>, T.C. Memo. 1998-111; <u>Dillon v. Commissioner</u>, T.C. Memo. 1998-5.

Christopher testified that he and petitioner owe $96,000 to the IRS for their 1981 through 1986 tax years.[7] In her "Appeals Transmittal and Case Memo", Ms. Flandez listed the tax owed for 1982 through 1986 as $20,300. According to an IRS transcript, as of August 26, 1998, petitioner and Christopher owed $20,300 in tax and approximately $61,000 in interest for their 1982 through 1986 tax years.

The Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, that petitioner and Christopher signed on February 28, 2003, contained the following statements: Petitioner and Christopher owned their home; they had no dependents they could claim on their tax return; they had a Bank of America checking account with a balance of $4,000;

---

[7] We note that the 1981 tax year is not in issue. See <u>supra</u> note 2.

Additionally, on brief petitioner makes claims regarding the total liability relating to the Hoyt investment for 1981 through 1996. Petitioner's tax years 1987 through 1996 also are not before the Court. Even if they were, according to petitioner's own estimate of the total tax liability, petitioner and her husband have substantial assets (real property and investments) and credit that could be used to pay the total tax liability for 1981 through 1996 without creating economic hardship.

their investments included (1) Vanguard--401(k) with a current value of $267,578, (2) Fidelity--401(k) with a current value of $14,007, and (3) a U.S. Savings Bond with a current value of $28; they had $100 of cash on hand; they had available credit of $19,750 from Discover Card and $4,200 from Capital One; they had life insurance with a current cash value of $20,455; they owned two cars (a 1991 Toyota Previa and a 1995 Toyota Avalon); they owned the following real estate (1) a home in Beverly Hills, Florida, purchased in June 1995 for $183,000, with a current value of $168,000, a loan balance of $150,245, and a monthly payment totaling $1,465, and (2) a home in Charlotte, North Carolina, purchased in October 2002 for $95,000, with a current value of $76,000, a loan balance of $75,000, and a monthly payment of $872; and no personal assets (i.e., zero).

In determining the current value of their investments, petitioner and Christopher valued them at 60 percent of the face value of the investments even though the Form 433-A states: "Current Value: Indicate the amount you could sell the asset for today." In determining the current value of their real estate, petitioner and Christopher valued their homes at "80 percent quick sale value" even though the Form 433-A states: "Current Value: Indicate the amount you could sell the asset for today."

Under the monthly income and expense analysis on Form 433-A, petitioner and Christopher listed monthly wages of $9,167 and monthly interest/dividends of $1,667 for total monthly income of $10,834. Under total living expenses, petitioner and Christopher listed $1,290 for food, clothing, and miscellaneous; $2,212 for housing and utilities; $573 for transportation; $1,173 for health care; $2,679 for taxes; $108 for child/dependent care; $56 for life insurance; $672 for other secured debt (second house); and $1,683 for other expenses comprising $600 in attorney's fees and $1,083 for church contributions. This brought their total expenses to $10,446 per month.

Attached to the Form 433-A were the following: A uniform residential appraisal report for the Beverly Hills, Florida, home with an estimate of fair market value, as of March 16, 1998, of $210,000; a Bank of America statement for petitioner and Christopher for the period December 13, 2002, through January 14, 2003, which listed (1) their average balance of $8,165, a beginning balance on December 13, 2002, of $12,423.62, and an ending balance of $5,150 in their checking account and (2) having an equity line of credit for $25,244.76; a Vanguard account statement listing a closing and vested balance as of December 31, 2002, totaling $478,278.71; a Fidelity account statement listing a closing and vested balance as of December 31, 2002, totaling $29,865.49; their 2001 tax return which listed a total of

$5,193.31 in medical expenses; and a self-prepared chart listing $6,018.70 in medical expenses that are not covered by their insurance and $1,014.35 under "Flex Plan" for 2002.

Petitioner testified that her oldest daughter, Tina, suffers from health problems, is totally disabled, and that the financial burden for her daughter rests on her and Christopher. Tina has her own home, does not live with petitioner and her husband, and petitioner and Christopher admitted that they cannot claim her as a dependent. We also note that on the Form 433-A, petitioner and Christopher stated that they had no dependents they could claim on their tax return.

Petitioner did not present evidence that demonstrated that petitioner will be unable to pay her reasonable basic living expenses if relief is not granted. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Some of the expense figures provided on the Form 433-A are unsupported and seem excessive.

Additionally, petitioner and her husband have substantial assets (real property and investments) and credit that could be used to pay a tax liability as high as $96,000 without creating economic hardship. We conclude that petitioner will not experience economic hardship if relief from the liabilities is not granted given her current level of income and assets. See Alt v. Commissioner, 119 T.C. at 314-315; Von Kalinowski v. Commissioner, supra; Walters v. Commissioner, supra; Dillon v.

Commissioner, supra.

We also may consider whether the requesting spouse was deserted, divorced, or separated. See Walters v. Commissioner, supra. Petitioner's husband has not disappeared or left petitioner to "face the music" alone. Hayman v. Commissioner, 992 F.2d at 1263; Von Kalinowski v. Commissioner, supra. Petitioner and Christopher remain married. The two have not separated, and petitioner has not been left by her husband to deal with the tax liabilities alone. Instead, petitioner continues to enjoy the lifestyle and financial security that are largely attributable to her husband's assets and income.

### 5. Conclusion

Petitioner was not denied access to financial records by her husband or threatened with physical violence if she objected to the Hoyt investment or questioned the tax returns. There was no physical or mental abuse by petitioner's husband, and he did not coerce her into investing in the Hoyt partnerships or signing the tax returns.

The understatements are not attributable to the erroneous items of one individual filing the joint returns for 1982 through 1986, petitioner had reason to know of the understatements on these returns, and it is not inequitable to hold the petitioner liable for the deficiencies in tax for 1982 to 1986. On the basis of all the facts and circumstances, we conclude that petitioner is not entitled to relief pursuant to section 6015(b).

B.    Relief Under Section 6015(f)

Respondent argues that he did not abuse his discretion in denying petitioner equitable relief under section 6015(f). Respondent's denial of relief is reviewed under an abuse of discretion standard.  Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002); Butler v. Commissioner, 114 T.C. at 292.  Our review is not limited to respondent's administrative record.  Ewing v. Commissioner, 122 T.C. ___ (2004).

Considering the facts and circumstances of this case, we held under section 6015(b)(1)(D) that it is not inequitable to hold petitioner liable for the deficiencies.  The language of section 6015(f)(1), "taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)" does not differ significantly from the language of section 6015(b)(1)(D), "taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement".[8]  Butler v. Commissioner,

_____

[8]  Additionally, the language in both sections is similar to the language in former sec. 6013(e)(1)(D), "taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement".  Butler v. Commissioner, 114 T.C. 276, 291 (2000); see Mitchell v. Commissioner, 292 F.3d 800, 806 (D.C. Cir. 2002) ("Subsection (f)
(continued...)

supra at 291.  Further, the equitable factors we considered under section 6015(b)(1)(D) are the same equitable factors we consider under section 6015(f).[9]  Alt v. Commissioner, supra at 316.  As a result, we hold that respondent did not abuse his discretion in denying petitioner relief under section 6015(f) for taxable years 1982 to 1986.

In this case, none of the six factors in Rev. Proc. 2000-15, 2000-1 C.B. 447, weighing in favor of granting relief are present:  (1) Petitioner was not divorced from her husband, (2) petitioner will not suffer economic hardship if relief is denied, (3) petitioner was not abused by her husband, (4) petitioner had "reason to know", (5) petitioner's husband did not have an obligation to pay the liability pursuant to a divorce decree, and (6) the items giving rise to the deficiencies are not

---

[8](...continued)
has no statutory antecedent as a stand alone provision, but has roots in the equity test of former subparagraph 6013(e)(1)(D) carried forward into subparagraph 6015(b)(1)(D)."), affg. T.C. Memo. 2000-332.

[9]  As directed by sec. 6015(f), the Commissioner prescribed procedures in Rev. Proc. 2000-15, 2000-1 C.B. 447, to be used in determining whether an individual qualifies for relief under sec. 6015(f).  The revenue procedure takes into account factors such as marital status, economic hardship, and significant benefit in determining whether relief will be granted under sec. 6015(f).  Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448.

We note that Rev. Proc. 2003-61, 2003-32 I.R.B. 296 (Aug. 11, 2003), superseded Rev. Proc. 2000-15, supra.  Rev. Proc, 2003-61, sec. 6, 2003-32 I.R.B. 296.  The new revenue procedure, however, is effective for requests for relief filed on or after Nov. 1, 2003.  Id.  Accordingly, it is inapplicable to the case at bar.

attributable solely to Christopher.  See <u>Washington v.</u> <u>Commissioner</u>, 120 T.C. 137, 147 (2003).  Additionally, the following factors weighing against relief are present:[10]  (1) The items giving rise to the deficiencies also are attributable to petitioner, (2) petitioner had "reason to know", and (3) petitioner will not suffer economic hardship.  <u>Id.</u>

Petitioner also argues that respondent made blanket "pro forma" denials of Hoyt investor section 6015 claims.  We disagree.

Respondent's internal memoranda contemplate that some Hoyt investors would qualify for section 6015 relief.  The memoranda do not reflect a decision to issue blanket denials to all Hoyt investor section 6015 claims.

Ms. Sneed testified that she processed claims granting section 6015 relief in other Hoyt investor cases she has reviewed.  Furthermore, Ms. Sneed credibly testified that she conducted a full, impartial, and fair evaluation of petitioner's section 6015 claim.

The format of the determination letter denying section 6015 relief for Hoyt investors was unique to the Hoyt cases.  This format was provided to Ms. Sneed.  Respondent did use uniform

---

[10]  The absence of factors weighing against equitable relief does not weigh in favor of granting relief--this is merely neutral.  See <u>Washington v. Commissioner</u>, 120 T.C. 137, 149 (2003) (absence of factor weighing in favor of equitable relief does not weigh against granting equitable relief--it is neutral).

procedures, and a uniform denial letter, in the Hoyt investor section 6015 cases; however, respondent did not make blanket denials of Hoyt investor section 6015 relief claims.  We find nothing abusive in using this form letter.

On the basis of all the facts and circumstances, we conclude that respondent did not abuse his discretion in denying petitioner relief pursuant to section 6015(f).

In reaching our holdings, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.