T.C. Memo. 2004-83

UNITED STATES TAX COURT

ANN E. BARTAK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5170-02.                    Filed March 23, 2004.

Terri A. Merriam, Wendy S. Pearson, and Jennifer A. Gellner,
for petitioner.

Margaret A. Martin, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined that petitioner did
not qualify for relief from joint and several liability pursuant
to section 6015(b), (c), or (f).[1]  The issue for decision is

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code, and all Rule references are to the Tax
(continued...)

whether petitioner is entitled to relief from joint and several liability pursuant to section 6015(b) or (f) for 1980, 1981, 1982, 1983, 1984, 1985, and 1986.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts, second stipulation of facts, third stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time she filed the petition, petitioner resided in Hacienda Heights, California.

### Petitioner and Her Husband

Petitioner has a high school education. After high school, petitioner worked for the telephone company for 2 years. Petitioner married Ernest F. "Joe" Bartak (Mr. Bartak) in 1964. As of the time of trial, petitioner and Mr. Bartak were married.

Petitioner wrote all the checks for the household expenses and maintained possession of the household checkbook. Petitioner handled all the household bills. Petitioner had access to all the family's tax information and documents.

### Petitioner's Relationship With Mr. Bartak

During the years in issue, family financial decisions were discussed between petitioner and Mr. Bartak. Mr. Bartak did not

---

[1](...continued)
Court Rules of Practice and Procedure.

[2] In her petition, petitioner sought relief pursuant to sec. 6015(b) and (f). Accordingly, sec. 6015(c) is not in issue.

conceal anything from petitioner.  Mr. Bartak did not deceive or mislead petitioner.  Mr. Bartak did not hide, or try to hide, any information or documents from petitioner.

Mr. Bartak never threatened or coerced petitioner into making investments, signing their tax returns, or signing checks. Mr. Bartak did not abuse petitioner.

Hoyt Partnerships

Walter J. Hoyt III and some members of his family were in the business of creating tax shelter limited partnerships for their cattle breeding operations (Hoyt partnerships).  As part of their services, the Hoyt organization also prepared the investor's tax returns.  For a description of the Hoyt organization and its operation, see Bales v. Commissioner, T.C. Memo. 1989-568; see also River City Ranches #1 Ltd. v. Commissioner, T.C. Memo. 2003-150; Mekulsia v. Commissioner, T.C. Memo. 2003-138; River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

Investment in SGE 1983-1 and TBS #1

In the early 1980s, Mr. Bartak heard about the Hoyt partnerships from his coworkers.  Mr. Bartak met with Mr. Hoyt and reviewed the Hoyt partnerships investment brochures.  He understood, and it was explained upfront, that he and petitioner would eventually have to pay taxes on an investment in the Hoyt partnerships.  Mr. Bartak was told that when he entered into a

Hoyt partnership he and petitioner would be able to receive a refund of all the money they paid in taxes for the last 3 years.

Mr. Bartak showed petitioner the Hoyt partnerships promotional materials, and she read them. Petitioner attended Hoyt organization meetings and met Mr. Hoyt. From 1983 through 1986, petitioner attended most, if not all, Hoyt organization meetings that were close to her home. Mr. Bartak asked Mr. Hoyt questions about the Hoyt partnerships in petitioner's presence so that petitioner could learn about the Hoyt partnerships. Petitioner also asked some questions about the Hoyt partnerships.

Petitioner understood that she and Mr. Bartak would obtain tax credits and deductions and that there would be large losses associated with their investment in the Hoyt partnerships. Petitioner knew that the tax aspects were a big part of the investment in the Hoyt partnerships.

Petitioner was not interested in investing in the Hoyt partnerships. Petitioner was skeptical about the Hoyt partnerships. She did not expect to make a profit even though Mr. Hoyt said they would. From the very beginning, "something about it didn't sit right with" petitioner, and she was never comfortable with the deductions claimed on her returns associated with the Hoyt partnerships.

On April 7, 1984, petitioner and Mr. Bartak signed subscription agreements to invest in Shorthorn Genetic

Engineering 1983-1 (SGE 1983-1), series "A" and "B" units.  Above their signatures, the documents state:  "The UNDERSIGNED intends that their signature hereon shall constitute not only a subscription but shall also constitute their signature to the Partnership Agreement".  Below petitioner's signatures the documents state:  "Signature of Spouse or other Subscriber if purchase is made jointly".  This was petitioner and Mr. Bartak's initial investment in one of the Hoyt partnerships.[3]

In 1983, petitioner and Mr. Bartak paid no "cash" to SGE 1983-1.  In 1984, petitioner and Mr. Bartak paid $17,000 in "cash" to SGE 1983-1.  By 1985, petitioner and Mr. Bartak had paid at least $31,000 in "cash" to SGE 1983-1.

In late 1984 or early 1985, after petitioner and Mr. Bartak invested in SGE 1983-1, they went to the Hoyt organization property (Hoyt ranch).  Between 1983 and 1986, petitioner went to the Hoyt ranch three to four times.  After their initial trip to the Hoyt ranch, petitioner and Mr. Bartak invested in other Hoyt partnerships including Timeshare Breeding Service #1, Ltd. (TBS #1).  Petitioner and Mr. Bartak signed a subscription agreement dated February 10, 1985, for TBS #1.  Below their signatures, the line next to "JOINT TENANTS WITH RIGHT OF SURVIVORSHIP" was marked.

---

[3] Petitioner and Mr. Bartak invested in additional Hoyt partnerships during and subsequent to the years in issue.

Neither petitioner nor Mr. Bartak sought advice from a tax professional about the Hoyt partnerships before or after investing. Arvis W. Drowns, Jr., petitioner and Mr. Bartak's tax return preparer before they invested in the Hoyt partnerships, did not review the Hoyt partnerships promotional materials. Petitioner never suggested seeking the advice of someone outside the Hoyt organization regarding the Hoyt partnerships. Mr. Bartak never consulted, or stated that he had consulted, with an independent tax professional regarding the Hoyt partnerships.

Mr. Bartak did not force petitioner to invest in, or sign documents related to, the Hoyt partnerships. There was no hostility or threats. Mr. Bartak wanted petitioner to sign the documents because he wanted to make sure she was fully aware of the investments.

Petitioner signed checks, including checks on accounts held jointly by petitioner and Mr. Bartak, made payable to Hoyt partnerships or the Hoyt organization. One of the checks petitioner wrote was for the "audit pool"--a fund for Hoyt partners who were audited by the Internal Revenue Service (IRS).

Petitioner and Mr. Bartak's Other Investments

In addition to the Hoyt partnerships, petitioner and Mr. Bartak had several other investments at the time they invested in

the Hoyt partnerships. Petitioner and Mr. Bartak owned stock and had invested in other partnerships.

One partnership petitioner and Mr. Bartak were partners in invested in real estate. Petitioner signed the documents for this partnership investment.

Another partnership petitioner and Mr. Bartak were partners in was Silver Screen Partners, Ltd. This partnership invested in movies that had not yet been made.

Another partnership petitioner and Mr. Bartak were partners in was Cornerstone Investment. Cornerstone Investment was formed to operate a building materials yard. Before they invested in Cornerstone Investment, petitioner and Mr. Bartak visited Cornerstone Investment's property and saw what Cornerstone Investment would be doing.

Mr. Bartak also invested in limited partnerships and real estate with his, and petitioner's, son William.

Documents from the Hoyt Organization

Petitioner and Mr. Bartak received promotional materials from the Hoyt organization about the Hoyt partnerships. Mr. Bartak accumulated and maintained a file of all the documents he received related to petitioner and Mr. Bartak's investments in Hoyt partnerships--whether from the Hoyt organization or from the IRS.

Mr. Bartak provided petitioner the Hoyt partnerships' brochures. Mr. Bartak did not deny petitioner access, or hide from petitioner, any documents related to their investment in the Hoyt partnerships. Mr. Bartak wanted petitioner to look at the Hoyt organization's materials and to hear what petitioner thought about the Hoyt partnerships.

One of the promotional materials petitioner and Mr. Bartak received included the following language under the heading Specific Risks Involved:  "A change in the tax laws or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay the tax along with penalties and interest".  It further stated:

> This term ["decapitated"] is crude, but it is a concept that is very applicable to the comparison of having a disallowance of your tax deductions by the Internal Revenue Service.  The prospect of having to pay the taxes when you have put your tax money into the cattle, and it's gone, is a financial wreck.

The brochure went on to state that there was no assurance that things would be "O.K." and:

> If you're like most people, your first impression of a W.J. HOYT SONS livestock purchase was "this deal looks to good to be true"!  We know you've heard "if a deal looks to good to be true, it probably is".  You probably looked at this business and thought at first "no way can that be legal".
>
> You only considered going into the cattle business after you heard about the tax benefits.  Tax benefits were your incentive to look at this kind of business.

BEWARE OF THE PITFALLS, HOWEVER.  Cattle breeding is a risky business and may also bring an IRS examination because it is lowering your taxes.

Another document, titled "Partnership Memorandum and Amended Agreement of Limited Partnership", petitioner and Mr. Bartak received from the Hoyt organization contained the following statements:

2.  THIS PARTNERSHIP INVOLVES CERTAIN RISKS TO THE PARTNERS, INCLUDING TAX RISKS (SEE "RISK FACTORS")
* * *.

* * * * * * *

4.  THE CONTENTS OF THIS MEMORANDUM ARE NOT TO BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE.  EACH PARTNER SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANT OR BUSINESS ADVISOR AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

* * * * * * *

Unit holders should consider the various investment risk factors of the Partnership, which are set forth in "Risk Factors," including the possibilities of adverse tax treatment * * *.

* * * * * * *

The Partnership has not received a ruling that it will be classified as a Partnership for Federal income tax purposes (See "Income Tax Consequences").

* * * * * * *

CERTAIN TAX CONSIDERATIONS.  In judging whether to subscribe for Units, a Partner should consider the tax consequences thereof which include, among others:  (a) possible taxation of an amount in excess of proceeds actually received on the sale of the Units and/or the Partnership properties and on undistributed net income, (b) the possibility that the Partnership will not be treated as a Partnership for tax purposes * * *, (c) the possibility that the Internal Revenue Service will

not give effect to the allocation of profits and losses contained in the Partnership Agreement, * * *, (e) the risk that an audit of the Partnership's income tax

return may result in an audit of a Limited Partners' own individual tax return * * *.

* * * * * * *

The income tax returns of the Partnership may be audited, and in turn, such audit may result in the audit of the returns of each Partner. In addition, the Commissioner of Internal Revenue has announced that the Service is engaged in a program of intensified audits of partnerships. Various deductions claimed by the Partnership on its returns of income could be disallowed in whole or in part on audit, which would result in an increase in the taxable income of the Partnership, and in turn, each Partner.

If a tax deficiency is determined, the taxpayer is liable for interest (compounded on a daily basis) on such deficiency from the due date of the return.

* * * * * * *

BASED ON THE INVESTMENT OBJECTIVES OF THE PARTNERSHIP, THE GENERAL PARTNERS BELIEVE THAT THERE ARE SUBSTANTIAL GROUNDS FOR ARGUING THAT THE PARTNERSHIP IS NOT A "TAX SHELTER." HOWEVER, NO ASSURANCE CAN BE GIVEN THAT THE IRS WILL NOT ATTEMPT TO CLASSIFY THE PARTNERSHIP AS A TAX SHELTER NOR WHETHER SUCH ATTEMPT WOULD BE SUCCESSFUL.

* * * * * * *

THE FOREGOING ANALYSIS CANNOT BE, AND IS NOT INTENDED AS, A SUBSTITUTE FOR CAREFUL TAX PLANNING, ACCORDINGLY, PARTNERS ARE URGED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THEIR TAX SITUATION AND THE EFFECTS OF OWNING PARTNERSHIP UNITS.

Tax Returns

Petitioner and Mr. Bartak filed joint Federal income tax returns for 1980, 1981, 1982, 1983, 1984, 1985, and 1986. For

1980, 1981, and 1982, Mr. Drowns prepared their returns.  For 1983, 1984, 1985, and 1986, the Hoyt organization prepared their returns.

On their joint income tax return for 1980, petitioner and Mr. Bartak reported $39,188 in wages.  In arriving at total income, the only additions and subtractions were $565 in interest income, $577 in taxable refunds of State and local taxes, and a $5,205 Schedule E, Supplemental Income Schedule, loss.  This Schedule E loss was attributable to petitioner and Mr. Bartak's investment in a non-Hoyt partnership.  The total tax listed was $3,664.  The Federal income tax withheld listed was $4,631.

On their joint income tax return for 1982,[4] petitioner and Mr. Bartak reported $48,797 in wages.  In arriving at total income, the only additions and subtractions were $312 in interest income, $14 in dividends, $570 in taxable refunds of State and local taxes, and a $1,017 Schedule E loss.  This Schedule E loss was attributable to petitioner and Mr. Bartak's investment in a non-Hoyt partnership.  The total tax listed was $5,714.  The Federal income tax withheld listed was $5,641.

On their joint income tax return for 1983, petitioner and Mr. Bartak reported $53,827 in wages.  In arriving at total income, the only additions and subtractions were $302 in interest income, $59 in dividends, $541 in taxable refunds of State and

---

[4]  Petitioner's 1981 joint return is not part of the record.

local taxes, and a $34,923 Schedule E loss.  Most of the Schedule E loss ($32,288) was attributable to the Hoyt partnerships.[5]  The total tax listed was zero.  The Federal income tax withheld listed was $6,532.

In 1984, petitioner and Mr. Bartak sold their real estate partnership investment.  Petitioner and Mr. Bartak had a large capital gain ($112,247) associated with the sale of this investment.

On their joint income tax return for 1984, petitioner and Mr. Bartak reported $51,993 in wages.  In arriving at total income, the only additions and subtractions were $9,785 in interest income, $1,707 in taxable refunds of State and local taxes, a $112,247 capital gain (related to the sale of the real estate partnership investment), and a $146,112 Schedule E loss.  Most of the Schedule E loss ($143,278) was attributable to petitioner and Mr. Bartak's investment in the Hoyt partnerships.  The total tax listed was $92.  The Federal income tax withheld listed was $5,874.

On their joint income tax return for 1985, petitioner and Mr. Bartak reported $48,667 in wages.  In arriving at total income, the only additions and subtractions were $10,249 in interest income, $454 in dividends, $1,343 in taxable refunds of

---

[5]  We make no finding that petitioner and Mr. Bartak's initial Hoyt partnership investment actually was in 1983.

State and local taxes, a $1,310 capital loss, and a $22,924 Schedule E loss. Most of the Schedule E loss ($22,646) was attributable to petitioner and Mr. Bartak's investment in the Hoyt partnerships. The total tax listed was $540. The Federal income tax withheld listed was $5,069.

On their joint income tax return for 1986, petitioner and Mr. Bartak reported $57,108 in wages. In arriving at total income, the only additions and subtractions were $11,123 in interest income, $279 in dividends, $1,389 in taxable refunds of State and local taxes, and a $34,733 Schedule E loss. Most of the Schedule E loss ($34,195) was attributable to petitioner and Mr. Bartak's investment in the Hoyt partnerships. The total tax listed was $320. The Federal income tax withheld listed was $6,569.

Petitioner reviewed her joint returns page by page and she looked at the items related to the Hoyt partnerships. The large losses associated with her investment in the Hoyt partnerships did not surprise her. Petitioner thought that the large deductions were the reason for investing in the Hoyt partnerships. Mr. Bartak specifically explained to petitioner the items on the 1983 return related to the Hoyt partnerships.

The Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued by Hoyt partnerships (SGE 1983-1 and TBS #1) to petitioner and Mr. Bartak for 1983, 1984, 1985, and 1986

list the following under the area for partner's name:  "Ernest F. & Ann E. Bartak".[6]

In 1984, petitioner and Mr. Bartak applied for a refund of their 1980, 1981, and 1982 taxes in the amounts of $3,714, $4,709, and $5,580, respectively.

On March 10, 1998, respondent mailed petitioner and Mr. Bartak a letter and report explaining computational adjustments made to their 1980, 1981, 1982, 1983, 1984, 1985, and 1986 returns as a result of adjustments made to the partnership returns of SGE 1983-1 for 1984, 1985, and 1986.  These computational adjustments resulted from the Court's opinion in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1996-515.

Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner

Petitioner and Mr. Bartak filed a notice of election to participate in one of the dockets (28383-89) of Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, supra, filed a joint motion to consolidate for trial, briefing, and opinion in that case, and

---

[6] This is also true for Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued by various Hoyt partnerships to petitioner and Mr. Bartak in the years subsequent to the years in issue (1987 through 1996), although some of the Schedules K-1 do not contain their middle initials and on some the word "and" is spelled out.  Again, we make no finding that petitioner and Mr. Bartak actually invested in the Hoyt partnerships in 1983.

filed a stipulation of facts in that case. Petitioner and Mr. Bartak signed each of these documents.

In the notice of election to participate, petitioner and Mr. Bartak stated:

> Ernest F. and Ann E. Bartak satisfy the requirements of Section 6226(d), Internal Revenue Code of 1986, because they were a partner during the applicable period(s) for which readjustment of partnership items is sought and, if such readjustment is made, the tax attributable to such partnership items may be assessed against them.

Request for Relief From Joint and Several Liability

On or about July 14, 2000, petitioner mailed respondent a Form 8857, Request for Innocent Spouse Relief (and Separation of Liability and Equitable Relief).[7] In 2001, Tax Examiner Bonnie F. Halbert (Ms. Halbert) was assigned to review petitioner's request for section 6015 relief.

In processing petitioner's claim, Betty Sneed, another employee of respondent, requested Hoyt partnership related information regarding petitioner and Mr. Bartak from Revenue Agent Deborah Ritchie.[8] Ms. Ritchie provided: A computer

---

[7] Petitioner requested relief for the tax years 1980 through 1997. On Nov. 14, 2000, respondent mailed petitioner a letter advising her that the request was premature for the years 1987 through 1996 as the request related to a potential assessment from a TEFRA (Tax Equity and Fiscal Responsibility Act of 1982) partnership proceeding that, as of that date, had not been concluded. On Nov. 30, 2000, respondent mailed petitioner a letter advising her that the request for 1993 was not premature. Petitioner's 1993 tax year is not before the Court.

[8] Ms. Ritchie worked on the "Hoyt audit team" and the "Hoyt (continued...)

printout for Hoyt partnerships taxable years related to petitioner and Mr. Bartak; copies of subscription agreements, powers of attorney, and partnership agreements signed by petitioner and Mr. Bartak; copies of Schedules K-1 issued to petitioner and Mr. Bartak from the Hoyt partnerships; and copies of checks signed by petitioner or Mr. Bartak made payable to Hoyt partnerships.

On November 28, 2000, petitioner's counsel mailed respondent a supplement to petitioner's section 6015 claim. Ms. Halbert reviewed and considered all the materials and information petitioner submitted regarding her section 6015 claim.

On August 10, 2001, Ms. Halbert prepared a written evaluation of petitioner's claim. Ms. Halbert concluded that petitioner was not entitled to section 6015(b) relief because petitioner knew of the Hoyt partnerships and owned the item that gave rise to the deficiency (i.e., the Hoyt partnerships). Ms. Halbert concluded that there were no factors favoring granting section 6015(f) relief and the following factors weighed against granting section 6015(f) relief: (1) Lack of economic hardship, (2) the liability was not solely attributable to the nonrequesting spouse, and (3) the requesting spouse had knowledge

---

[8](...continued)
tax shelter project". The Hoyt tax shelter project examined Hoyt partnerships. Ms. Ritchie assisted District Counsel in preparing Hoyt partnerships cases for trial.

or reason to know.  Accordingly, Ms. Halbert concluded it was not inequitable to hold petitioner liable.

On August 24, 2001, respondent mailed petitioner a preliminary determination with respect to petitioner's request for relief from joint and several liability for 1980 through 1986.  Respondent determined that petitioner was not entitled to relief pursuant to section 6015(b), (c), or (f).

On November 27, 2001, respondent mailed petitioner a notice of determination that determined petitioner was not entitled to relief from liability pursuant to section 6015(b), (c), or (f) for 1980 through 1986.  That same day, respondent mailed Mr. Bartak a letter notifying him that petitioner's request for relief from joint and several liability had been denied.

After the petition and answer in this case were filed, petitioner's section 6015 claim was forwarded to respondent's Appeals Office.  Appeals Officer Gloria J. Flandez was assigned to review petitioner's case.  Ms. Flandez reviewed and considered the information submitted to her by petitioner and her attorneys.

On or about November 6, 2002, after completing her review of petitioner's case, Ms. Flandez prepared an Appeals Case Memorandum.  Ms. Flandez concluded that petitioner was not entitled to relief from liability pursuant to section 6015(b), (c), or (f) for 1982 through 1986.  Appeals Team Manager Robert M. Spooner approved Ms. Flandez's Appeal Case Memorandum.

Petitioner's Financial Status

On February 28, 2003, petitioner and Mr. Bartak signed a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. The Form 433-A contained the following statements: Petitioner and Mr. Bartak owned the home that they purchased in July 1984 for $200,000, with a current value of $236,590, a loan balance of $86,931, and a monthly payment totaling $1,698; they had no dependents they could claim on their tax return; they had two checking accounts, one at US Bank and the other with F&A Federal Credit Union, with a total balance of $9,014; and they had "other" accounts, two with Whittier Municipal Credit Union, one with F&A Credit Union, and one with A.G. Edwards & Sons, Inc., with a total balance of $46,689. Their investments (Form 433-A investments), listed as totaling $285,872, included: (1) Horizons (Deferred Comp) with a current value of $80,949; (2) Keyport (Annuity) with a current value of $17,163; (3) New York Life (Var. Annuity) with a current value of $42,524; (4) Uniprop Income FWD II with a current value of $17,500; (5) U.S. Savings Bonds with a current value of $13,300; (6) U.S. Savings Bonds (Ann's Trust) with a current value of $2,450; (7) Cornerstone with a current value of $72,000; (8) Lucent Technologies with a current value of $3,685; (9) N.C.R. with a current value of $88; (10) Vodaphone with a current value of $1,176; (11) Verizon with a current value of $5,851;

(12) AT&T with a current value of $1,598; (13) S.B.C. with a current value of $11,375; (14) Q with a current value of $748; and (15) Fidelity Invest. with a current value of $15,465.  They had available credit of $39,000.  They also owned two cars (a 2000 Chevy Suburban and a 2002 Honda Civic) worth a total of $31,915 and with outstanding loans totaling $30,219; they listed no personal assets (i.e., zero).

In determining the current value of their Form 433-A investments, petitioner and Mr. Bartak valued them at 70 percent of the face value even though the Form 433-A states:  "Current Value:  Indicate the amount you could sell the asset for today." In determining the current value of their real estate, petitioner and Mr. Bartak valued their home at "80% quick sale value" even though the Form 433-A states:  "Current Value:  Indicate the amount you could sell the asset for today."

Under the monthly income and expense analysis on Form 433-A, petitioner and Mr. Bartak listed monthly wages of $1,561, monthly interest/dividends of $200, monthly pension/Social Security of $7,051, and other (settlement) of $796 per month for total monthly income of $9,608.  Under total living expenses, petitioner and Mr. Bartak listed $1,600 for food, clothing, and miscellaneous; $2,452 for housing and utilities; $1,205 for transportation; $175 for health care; $2,390 for taxes; and $850 for other expenses comprising attorney's fees ($600), church

contributions ($230), and dues ($20).  This brought their total expenses to $8,672 per month.

Attached to the Form 433-A were the following:  An annual property tax bill for the fiscal year July 1, 2002, to June 30, 2003, from Los Angeles County for petitioner and Mr. Bartak's home with a current assessed value and taxable value of $295,738; a statement from the County of Los Angeles Deferred Compensation and Thrift Plan (Horizons) listing a total account balance of $115,641.11 as of December 31, 2002; a US Bank statement listing an ending balance of $1,560.31 as of January 22, 2003; a F&A Federal Credit Union statement listing a total ending balance of $7,453.78 as of January 31, 2003; a F&A Federal Credit Union statement listing a total ending balance of $7.11 as of December 31, 2002 (this account is separate from the one with the $7,453.78 account balance); a Whittier Municipal Employees Federal Credit Union statement, account number 4228006, listing an ending balance of $456.34 as of December 31, 2002; a Whittier Municipal Employees Federal Credit Union statement, account number 1061001, listing an ending balance of $1,225.84 as of December 31, 2002; and their 2001 joint tax return which listed adjusted gross income of $56,283.  In arriving at adjusted gross income, their 2001 joint return listed $83,889 in total pension and annuities and a taxable amount of $31,937.

OPINION

## I.  Evidentiary Issue

As a preliminary matter, we must decide whether a document petitioner submitted during the trial of this case should be admitted into evidence.  At trial, petitioner sought to introduce a "fraud referral" memorandum for Walter J. Hoyt III (Exhibit 187-P).  Respondent objected to the admission of Exhibit 187-P on the grounds of authentication, relevance, and hearsay.  We reserved ruling on Exhibit 187-P's admissibility.

Petitioner failed to make any arguments regarding the admissibility of Exhibit 187-P in her opening brief.  In her reply brief, petitioner stated:  "Petitioner has addressed the relevance and purpose of Exhibit 187-P in her opening brief, in the context of proposed findings of fact."

For the reasons stated in Doyel v. Commissioner, T.C. Memo. 2004-35 (abandonment, hearsay, lack of authenticity, relevancy, and wastefulness), we do not admit Exhibit 187-P into evidence.

## II.  Section 6015 Relief

In general, spouses filing joint Federal income tax returns are jointly and severally liable for all taxes due.  Sec. 6013(d)(3).  Under certain circumstances, however, section 6015 provides relief from this general rule.  Except as otherwise provided in section 6015, petitioner bears the burden of proof.

Rule 142(a); <u>Jonson v. Commissioner</u>, 118 T.C. 106, 113 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

In arguing that petitioner is entitled to relief pursuant to section 6015, petitioner relies upon the regulations related to section 6015. Sections 1.6015-0 through 1.6015-9, Income Tax Regs., are applicable for elections or requests for relief filed on or after July 18, 2002. Sec. 1.6015-9, Income Tax Regs. Petitioner filed her election prior to this date; accordingly, the regulations are inapplicable.

Petitioner also cites chief counsel advice and Tax Court summary opinions to support her claims. Parties are statutorily proscribed from citing chief counsel advice as precedent. Sec. 6110(k)(3); see <u>Willamette Indus., Inc. v. Commissioner</u>, 118 T.C. 126, 134 n.10 (2002). By statute, summary opinions shall not be treated as precedent. Sec. 7463(b).

A. <u>Relief Under Section 6015(b)</u>

To qualify for relief from joint and several liability under section 6015(b)(1), a taxpayer must establish:

> (A) a joint return has been made for a taxable year;

> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

        (D) taking into account all the facts and
circumstances, it is inequitable to hold the other
individual liable for the deficiency in tax for such
taxable year attributable to such understatement; and

        (E) the other individual elects (in such form as
the Secretary may prescribe) the benefits of this
subsection not later than the date which is 2 years
after the date the Secretary has begun collection
activities with respect to the individual making the
election * * *.

The requirements of section 6015(b)(1) are stated in the conjunctive.  Accordingly, a failure to meet any one of them is sufficient for us to find that petitioner does not qualify for relief pursuant to section 6015(b).  Alt v. Commissioner, 119 T.C. 306, 313 (2002).

Respondent contends that petitioner failed to establish the requirements of subparagraphs (B), (C), and (D).  Petitioner admits that the Hoyt partnerships caused the erroneous items on the returns.  Petitioner, however, contends that the Hoyt partnerships are not attributable to her.

Petitioner was a partner in the Hoyt partnerships.  She signed documents relating to her and Mr. Bartak's investment in the Hoyt partnerships.  See Hayman v. Commissioner, 992 F.2d 1256, 1260-1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228. Although petitioner may have signed checks to the Hoyt organization because Mr. Bartak asked her, some of the checks made payable to Hoyt partnerships were drawn on petitioner and Mr. Bartak's joint bank account.

Furthermore, it is clear that the Hoyt organization treated her, and Mr. Bartak, as a partner in the Hoyt partnerships. The Schedules K-1 the Hoyt organization issued regarding their investment in SGE 1983-1 and TBS #1 listed petitioner as a partner in these Hoyt partnerships.

Finally, Mr. Bartak may have taken the initiative and played a more dominant role in deciding to invest in the Hoyt partnerships, but petitioner agreed to invest in the Hoyt partnerships and she did it jointly with Mr. Bartak. Petitioner testified that she thought that she and Mr. Bartak personally owned the cattle at the Hoyt ranches. Additionally, petitioner admitted, in her petition and the notice of election to participate in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1995-515, to being a partner in SGE 1983-1.

Accordingly, we conclude that the understatements are not attributable to the erroneous items of one individual filing the joint returns. See Ellison v. Commissioner, T.C. Memo. 2004-57, (investment in Hoyt partnership was attributable to the taxpayer requesting section 6015 relief because she was a partner in the Hoyt partnership); Doyel v. Commissioner, T.C. Memo. 2004-35 (same).

The failure to meet the requirements of section 6015(b)(1)(B) is sufficient for us to find that petitioner does

not qualify for relief pursuant to section 6015(b).  Alt v. Commissioner, supra at 313.  Although we need not decide whether petitioner satisfies the requirements of subparagraphs (C) and (D), for the sake of completeness, we shall briefly discuss the application of 6015(b)(1)(C) and (D).  See Jonson v. Commissioner, supra at 119.

This case is appealable to the U.S. Court of Appeals for the Ninth Circuit.  Accordingly, with regard to section 6015(b)(1)(C), we apply the standard set forth in Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989), revg. an Oral Opinion of this Court.  Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  For reasons similar to those stated in Doyel v. Commissioner, supra, in which we applied the standards set forth in Price, petitioner had reason to know of the understatements.

Contrary to her assertion, petitioner was involved in her family's financial affairs.  Although she may have not played a "dominant" role or been the initiator, the decision to invest in the Hoyt partnerships was made in consultation with petitioner. Petitioner was shown the documents relating to the Hoyt investments, signed Hoyt investment documents, was aware that the Hoyt investment was supposed to result in substantial tax savings, and attended Hoyt investor meetings.

Petitioner was aware of the large deductions taken on her joint tax returns associated with the Hoyt investments. The Hoyt investment materials she was shown and had the opportunity to review apprised her of tax risks associated with the investment. These facts establish that petitioner had "reason to know". See Jonson v. Commissioner, 118 T.C. at 117.

Petitioner and her husband testified that petitioner was aware of the investment in the Hoyt partnerships, that she had access to all of the files/information regarding the Hoyt investment, and that Mr. Bartak made no effort to deceive petitioner regarding the family's financial affairs. This further supports a finding that petitioner had reason to know of the understatement. Id. at 118.

Petitioner claims that Mr. Hoyt's deceit is relevant to the determination of "reason to know". Although Mr. Hoyt's deceit may be relevant, it does not lead to the result petitioner seeks.

The purpose of section 6015 relief is to protect one spouse from the overreaching or dishonesty of the other. Purcell v. Commissioner, 826 F.2d 470, 475 (6th Cir. 1987), affg. 86 T.C. 228 (1986). Relief is inappropriate where it would allow the requesting spouse to escape liability for apparently legitimate claims that are later disallowed. See Bartlett v. Commissioner, T.C. Memo. 1997-413.

As was the case in Mora v. Commissioner, 117 T.C. 279, 288

(2001), where we denied relief under section 6015(b) in a case involving Hoyt investments, neither petitioner nor Mr. Bartak knew the facts that made the flowthrough losses from the Hoyt partnerships unallowable as deductions on their joint returns, and both petitioner and Mr. Bartak put their trust in the Hoyt organization to determine the basis for, propriety of, and amount of their deductions.

It is significant that petitioner knew (1) of the Hoyt investment, (2) the Hoyt investment was designed to generate large deductions resulting in substantial tax savings, (3) those deductions were taken on joint returns for the years in issue, and (4) there was a risk that the deductions might be disallowed by the IRS. Jonson v. Commissioner, 118 T.C. at 118.

"Tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing * * * the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability." Hayman v. Commissioner, 992 F.2d at 1262. Furthermore, the court in Price noted that the size of the deduction in issue vis-a-vis the total income reported on the return, when considered in light of the fact that the taxpayer knew of the investment and its nature, is enough to put the taxpayer on notice that an understatement exists (and, therefore, if the duty of inquiry is not discharged, leads to an

imputation of "reason to know" of the understatement). Price v. Commissioner, 887 F.2d at 966 ($90,000 deduction and just more than $100,000 in income). Petitioner did not satisfy her duty to inquire. Id. at 965-966; see also Mora v. Commissioner, supra at 289 (involving a Hoyt investment).

A reasonable person, faced with petitioner's circumstances and in petitioner's position, would have had reason to know of the understatement. We conclude that under the Price approach petitioner had reason to know of the understatements.

Furthermore, for reasons similar to those stated in Doyel v. Commissioner, supra, and discussed infra regarding section 6015(f), it is not inequitable to hold petitioner liable for the understatements contained on her joint returns. We note that the equitable factors we consider under section 6015(b)(1)(D) are the same equitable factors we consider under section 6015(f). Alt v. Commissioner, 119 T.C. at 316.

The understatements are not attributable to the erroneous items of one individual filing the joint returns for 1980 through 1986, petitioner had reason to know of the understatements on these returns, and it is not inequitable to hold the petitioner liable for the deficiencies in tax for 1980 to 1986. On the basis of all the facts and circumstances, we conclude that petitioner is not entitled to relief pursuant to section 6015(b).

B.   Relief Under Section 6015(f)

Respondent argues that he did not abuse his discretion in denying petitioner equitable relief under section 6015(f). Respondent's denial of relief is reviewed under an abuse of discretion standard.  Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002); Butler v. Commissioner, 114 T.C. 276, 292 (2000).  Our review is not limited to respondent's administrative record.  Ewing v. Commissioner, 122 T.C. 32 (2004).

As directed by sec. 6015(f), the Commissioner prescribed procedures in Rev. Proc. 2000-15, 2000-1 C.B. 447,[9] respondent uses to determine whether an individual qualifies for relief under section 6015(f).

1.   Revenue Procedure Enumerated Factors

In this case, none of the six factors in Rev. Proc. 2000-15, 2000-1 C.B. 447, weighing in favor of granting relief are present:  (1) Petitioner was not separated or divorced from Mr. Bartak, (2) petitioner will not suffer economic hardship if relief is denied, (3) petitioner was not abused by Mr. Bartak, (4) petitioner knew or had reason to know of the item giving rise

_____

[9]   We note that Rev. Proc. 2003-61, 2003-32 I.R.B. 296 (Aug. 11, 2003), superseded Rev. Proc. 2000-15, 2000-1 C.B. 447.  Rev. Proc. 2003-61, sec. 6, 2003-32 I.R.B. at 299.  The new revenue procedure, however, is effective for requests for relief filed on or after Nov. 1, 2003.  Id.  Accordingly, it is inapplicable to the case at bar.

to the deficiency, (5) Mr. Bartak did not have an obligation to pay the liability pursuant to a divorce decree, and (6) the items giving rise to the deficiencies are not attributable solely to Mr. Bartak.  See Washington v. Commissioner, 120 T.C. 137, 147 (2003).  Additionally, the following factors weighing against relief are present:[10]  (1) The items giving rise to the deficiencies are attributable to petitioner, (2) petitioner knew or had reason to know of the item giving rise to the deficiency, and (3) petitioner will not suffer economic hardship.  Id.

As we found, supra, the items giving rise to the deficiencies are attributable to petitioner, and she knew or had reason to know of the understatements under the Price standard.

Petitioner's tax liabilities for 1980 through 1986 totaled $82,680.  Even if we were to include the interest due on that liability as of April 2002 (the most current information available in the record), petitioner and Mr. Bartak have hundreds of thousands of dollars in assets in excess of this amount.

As of February 2003, based on the information she provided, the assets listed on the Form 433-A had a total current fair market value of approximately $675,000.[11]  Additionally, after

--------

[10]  The absence of factors weighing against equitable relief does not weigh in favor of granting relief--they are neutral. Doyel v. Commissioner, T.C. Memo. 2004-35; see Washington v. Commissioner, 120 T.C. 137, 149 (2003).

[11]  In reaching this figure, we used the following figures:
(continued...)

allowing petitioner expenses of $8,672 listed on the Form 433-A--
a figure provided on the Form 433-A and not entirely
substantiated by underlying evidence--petitioner had $936 per
month (approximately $11,232 per year) available to pay toward
the outstanding tax liability.

We note that, at trial, Mr. Bartak claimed that the amount
of monthly wages should have been listed as $1,400 as opposed to
the $1,561 listed on the Form 433-A. Even if we were to accept
this figure, based on petitioner and Mr. Bartak's 2001 return, it
appears that they understated the amount of their monthly income.
The Form 433-A reflects $200 per month of interest and dividend
whereas their 2001 return reported $5,621 of taxable interest
(i.e., approximately $468 per month) and $1,551 of dividend
income (i.e., approximately $129 per month). The 2001 return
also reported $6,005 of Schedule E income (i.e., approximately
$500 per month) which is not reflected on the Form 433-A. If we

---

[11](...continued)
$9,014 for the checking accounts, $46,689 for the "other"
accounts, $408,388 for the Form 433-A investments (the 100
percent fair market value of the other investments (the $285,872
listed 70 percent value adjusted to 100 percent--i.e., $285,872
divided by 70 percent equals $408,388), $1,696 for the cars
($31,915 minus the outstanding debt of $30,219) and $208,807 for
the equity in their home (based on a fair market value of
$295,738, as listed on their tax bill, minus the outstanding debt
of $86,931). The amount listed on their real estate tax bill
appears to represent fair market value. Cal. Rev. & Tax. Code
secs. 110, 110.5, 401 (West 1998). This figure does not include
the $39,000 of credit petitioner listed as available on the Form
433-A.

were to make all these adjustments, total income would equal approximately $10,345 per month leaving $1,673 per month (approximately $20,007 per year) available to pay towards the outstanding tax liability.

Petitioner did not present evidence that demonstrated that petitioner will be unable to pay her reasonable basic living expenses if relief is not granted. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Some of the expense figures provided on the Form 433-A are unsupported and seem excessive. Accordingly, we conclude that respondent was correct, and did not abuse his discretion, in determining that petitioner would not suffer economic hardship.

### 2. Additional Facts and Circumstances

Petitioner claims that Mr. Bartak played the dominant role in handling the financial affairs of their family and she did not have a choice not to sign the Hoyt documents or her tax returns. Petitioner testified that Mr. Bartak "usually" handled the family's investments and that he would come to her about an investment after he investigated it and thought they should invest. Petitioner may have left the final decision to invest in the Hoyt partnerships to Mr. Bartak; however, petitioner acquiesced or agreed to go along with Mr. Bartak's wishes.

Petitioner also claims that she did not want to sign the Hoyt partnership documents or her returns. Petitioner, however,

testified that she signed the documents to "avoid making things difficult at home."

Petitioner further testified that when she signed the tax returns in issue, she would say: "I'm signing this under protest." Petitioner, however, explained that she merely stated this as an expression of her frustration and that she signed the returns in order to keep peace in the family. Petitioner and Mr. Bartak testified that Mr. Bartak (1) did not force her, or threaten her, to sign the returns, Hoyt documents, or checks, (2) did not force her, or threaten her, to invest in the Hoyt partnerships, and (3) that Mr. Bartak did not abuse her.

Petitioner also notes that Mr. Bartak opened all the mail from the Hoyt organization and the IRS. Petitioner testified that she could have looked at the mail and Mr. Bartak's files regarding the Hoyt partnerships if she had wanted. Mr. Bartak did not hide, or try to hide, any mail from petitioner. Petitioner testified that she saw everything that she wanted to see.

Petitioner claims that Mr. Hoyt's deceit is relevant to the determination whether petitioner is entitled to relief under section 6015(f). Ms. Flandez considered the fact that both petitioner and Mr. Bartak were deceived by Mr. Hoyt. Even if Mr. Hoyt's deceit is relevant, it does not lead to the result petitioner desires.

The purpose of section 6015 is to protect one spouse from the overreaching or dishonesty of the other.  See Purcell v. Commissioner, 826 F.2d at 475.  The understatement in tax in this case is attributable to a mistaken belief on the part of both petitioner and Mr. Bartak as to the legitimacy of the tax shelter deductions.  Under these circumstances, we perceive no inequity in holding both spouses to joint and several liability.  Bokum v. Commissioner, 94 T.C. 126, 146 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); McCoy v. Commissioner, 57 T.C. 732, 735 (1972).

In considering all the facts and circumstances, it is worth noting that petitioner was skeptical about the supposed tax benefits provided by the Hoyt partnerships.  Petitioner testified that she was uncomfortable with the Hoyt partnerships because she was leery that "something like this" (i.e., the tax problems) would happen and that she "had a real foreboding about it".  Petitioner also testified that she had an uneasy feeling about the tax aspects of the Hoyt partnerships.

Furthermore, petitioner and Mr. Bartak took Hoyt partnership deductions on their 1983 return.  Mr. Bartak testified that he thought he and petitioner invested in SGE 1983-1 in 1983.  They did not sign any documents, however, related to their investment in a Hoyt partnership until April 1984.  Taking deductions for years prior to their investment in the Hoyt partnerships should have raised additional suspicions.

Ms. Flandez also noted that the arguments petitioner presented to her raised the possibility of asset transfers in an attempt to avoid collection.

Petitioner also argues that respondent made blanket "pro forma" denials of Hoyt investor section 6015 claims. We disagree. Respondent's agents assigned to review petitioner's claim conducted a full, impartial, and fair evaluation of petitioner's section 6015 claim. They reached their conclusions on the basis of the facts and circumstances present in this case. See also <u>Doyel v. Commissioner</u>, T.C. Memo. 2004-35, in which we further explained the flaws in petitioner's arguments on this issue.

On the basis of all the facts and circumstances, we conclude that respondent did not abuse his discretion in denying petitioner relief pursuant to section 6015(f).

In reaching our holdings, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.